**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| 10x GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>Plaintiffs,<br><br>v.<br><br>ELEMENT BIOSCIENCES, INC.,<br><br>Defendant. | C.A. No. 26-cv-_____<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiffs 10x Genomics, Inc. ("10x") and President and Fellows of Harvard College ("Harvard") allege in their Complaint for patent infringement against Defendant Element Biosciences, Inc. ("Element") as follows:

## NATURE OF THE ACTION

1.     This is an action for infringement of U.S. Patent Nos. 11,021,737 ("the 737 Patent"), 11,566,276 ("the 276 Patent"), 11,566,277 ("the 277 Patent"), and 12,264,358 ("the 358 Patent") (collectively, the "Harvard Patents"). This action arises under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. § 271.

## THE PARTIES

2.     10x is a Delaware corporation with its principal place of business at 6230 Stoneridge Mall Road, Pleasanton, CA 94588.

3.     10x is a pioneering innovator of genomics and sequencing technologies that are providing life science researchers and clinicians an unprecedented understanding of biology. By elegantly combining its proprietary hardware, chemistry, and software, 10x has developed and

brought to market award-winning products that give single cell and spatial views of complex biological systems. 10x's products have enabled previously infeasible forms of research in the life sciences in areas of critical importance to human health, including cancer research, neuroscience, immunology, infectious disease, and developmental biology.

4.    Harvard is a Massachusetts nonprofit educational institution with a principal place of business in Cambridge, MA and an address at 1350 Massachusetts Avenue, Cambridge, MA 02138. Harvard is the patent owner and licensor of the Harvard Patents.

5.    On information and belief, Element is a Delaware corporation with its principal place of business in San Diego, CA.

6.    Element makes, uses, sells, offers to sell, exports, and/or imports in the United States products, services, and components that have been and are used to infringe one or more claims of the Harvard Patents.

## JURISDICTION AND VENUE

7.    Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

8.    This civil action for patent infringement arises under the patent laws of the United States, 35 U.S.C § 1 *et seq.*, including in particular under 35 U.S.C. § 271. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.    This Court has personal jurisdiction over Defendant, and venue is proper in this district pursuant to 28 U.S.C. § 1400(b), because Element is a Delaware corporation and thus resides in this district.

## BACKGROUND

### A.    10x's Single Cell Technologies

10.    10x is a life sciences technology company founded in 2012 in Pleasanton, California by Drs. Serge Saxonov and Benjamin Hindson. Since its inception, 10x has focused on building new technologies to enable breakthrough discoveries and accelerate the understanding of biology. To date, 10x has invested hundreds of thousands of hours and over $2 billion in research and development to invent, design, and develop its proprietary line of products for understanding biology at unprecedented resolution and scale. 10x continues to invest significant time and money to further innovate and bring ground-breaking new products and capabilities to market.

11.    In the 10-plus years since its first product launch in 2015, 10x's expanding suite of products has fueled a revolution in genomics, winning wide acclaim and commercial success. 10x has achieved an installed base of more than 8,000 instruments around the world, including at all of the top 100 global research institutions and all of the top 20 global biopharmaceutical companies. Annual sales of 10x products were approximately $600 million in each of 2024 and 2025.

12.    More than 10,000 high-impact scientific articles have been published based on data generated from 10x products, including hundreds of articles in top journals *Cell*, *Science*, and *Nature*. This scientific work illustrates the use of 10x products to discover, for example: molecular mechanisms that lead to brain, breast, and lung cancers; how the immune system reacts to COVID-19 infections; and a new type of lung cell that causes cystic fibrosis. The paradigm-changing nature of 10x's products has led to numerous accolades, including these products being named to *The Scientist* magazine's Top 10 Innovations List in 2015, 2017, 2018, 2019, 2020, and 2021.

13.    Since its launch in 2016, 10x's award-winning Chromium platform has been essential to enabling single cell genomics—the study of gene activity on a cell-by-cell basis. The genetic code contained in a person's DNA inside the nucleus of each cell is transcribed into a

nucleic acid called messenger RNA (mRNA), which is then in turn translated into the proteins that implement the cell's biological functions. The full range of mRNA expressed in a cell is known as its "transcriptome." A cell's transcriptome can provide insight into how it is differentiated from other cells and whether it may be cancerous or otherwise disordered. The study of cellular transcriptomes is known as transcriptomics. In contrast to prior techniques, in which genetic material from biological tissue was blended and analyzed in bulk, cell-by-cell analysis preserves the heterogeneity of cells and their transcriptomes within larger biological samples. For example, a cancer tumor can consist of a varied population of cells, some healthy and some cancerous, and the cancerous cells themselves may consist of genetically distinct subpopulations that are susceptible to different therapeutics. Prior techniques for sequencing the genomic make-up of a sample did not preserve this type of complexity, but it can be fully captured using 10x's single-cell analysis solutions such as the Chromium platform. Just two years after 10x launched the Chromium platform, *Science* magazine hailed cell-by-cell developmental analysis as the "2018 Breakthrough of the Year." *See* https://www.science.org/content/article/breakthrough-2018. The Chromium X, which launched in July 2021, enables the expansion of single-cell studies to experiments on the scale of a million cells and was named a Top 10 Innovation in 2021 by *The Scientist* magazine.

**B.      10x's Spatial Technologies**

14.      10x is also a pioneer in the field of spatial biology, which facilitates the study of gene activity in cells within their spatial context. Spatial analysis enables researchers and clinicians not only to study the varied genetic make-up of cells in a sample but also to map where in the tissue the different cells are found. The relationship between cells and their relative locations within a tissue provides insights instrumental to helping scientists gain a better understanding of biological processes and disease. For instance, in the context of cancer tumors, understanding the

arrangement of cells within the tumor allows researchers to interrogate how various cellular structures contribute to tumor development, progression, and metastasis. *See* Rohit Arora, et al. *Spatial transcriptomics reveals distinct and conserved tumor core and edge architectures that predict survival and targeted therapy response*, 14 Nature Comms. 5029 (2023).

15.    In 2020, *Nature Methods* named spatially resolved transcriptomics its "Method of the Year" and featured 10x's spatial technology on the cover. Vivien Marx, Method of the Year: spatially resolved transcriptomics, 18 *Nature Methods* 9-14 (2021). https://doi.org/10.1038/s41592-020-01033-y. 10x's Visium Spatial Gene Expression Solution was named among *The Scientist* magazine's Top 10 Innovations in 2020. In August 2025, a survey of nearly 200 researchers within the spatial transcriptomics field identified 10x's Visium platform as number one in terms of awareness, usage, and researchers' interest. *See* Andrew P. Han, *Spatial Omics Technology Survey Reveals 'Long Tail' of Interest Across Many Platforms,* GenomeWeb (August 13, 2025), https://www.genomeweb.com/gene-expression-rna-sequencing/spatial-omics-technology-survey-reveals-long-tail-interest-across?utm_source=Sailthru&utm_medium=email&utm_campaign=GWDN%20Wed%20PM%202025-08-13&utm_term=GW%20Daily%20News%20Bulletin.

16.    In 2020, 10x announced its acquisition of ReadCoor, Inc., a company founded and based on Professor George Church's work at Harvard, obtaining intellectual property, key technology advances, and deep talent and expertise in the emerging field of analyte detection and analysis in biological samples, including cell and tissue samples.

17.    On December 8, 2022, 10x Genomics commercially launched its Xenium Platform, built from its investments in Harvard's technology. Xenium is a complete platform—including the Xenium Analyzer instrument, Xenium reagents and panels, Xenium Explorer software, and the

full support of 10x's team of experts—designed to create spatial maps of gene expression in the original tissue at true cellular and subcellular resolutions. Researchers throughout the world use the Xenium platform to map tumor microenvironments, validate potential novel drug targets, and understand cellular organization within native tissue. For example, the Asia-Pacific Spatial Translational Research Alliance uses custom Xenium panels to map how cancer and immune cells communicate in ten major cancer types. *See* https://investors.10xgenomics.com/news/news-details/2025/New-ASTRA-Consortium-Unites-Asia-Pacific-Scientists-to-Build-Pan-Cancer-Spatial-Atlas-Powered-by-10x-Genomics-Xenium/default.aspx; *see also,* Shunsuke A. Sakai et al., *Single-cell spatial analysis with Xenium reveals anti-tumour responses,* 133 British Journal of Cancer 795-808 (2025), available at https://www.nature.com/articles/s41416-025-03088-0; Jiang Chang, et al., *Single-cell multi-stage spatial evolutional map of esophageal carcinogenesis,* 43 Cancer Cell, 380-397 (March 10, 2025), available at https://www.cell.com/cancer-cell/fulltext/S1535-6108(25)00061-3.

18.     On April 18, 2026, 10x announced Atera, its new spatial biology platform. *See* https://www.prnewswire.com/news-releases/10x-genomics-introduces-atera-a-new-platform-to-redefine-how-biology-is-measured-and-understood-302746542.html; https://www.genengnews.com/topics/omics/10x-genomics-unveils-atera-spatial-platform-at-aacr-meeting/. The Atera platform includes an all-in-one instrument for sample imaging, liquid handling, hardware stabilization, and onboard analysis. It enables 800 whole transcriptome samples per year, a 500mm$^2$ imageable area per slide, and 4 slides per instrument run. Users can choose from Atera WTA that allows for analysis of 18,000 genes or Atera Select 1,000 custom gene panels with optional stacking of up to two 1,000-gene panels. *See* https://assets.10xgenomics.com/asset/1d68f7e0-22f3-42e6-a5d2-

a8822e10694e/10x_LIT000613_Atera_Product_Sheet_Letter_Digital_RevA.pdf;

https://www.10xgenomics.com/platforms/atera.

19.     10x's Atera platform has already won praise from early access users, including researchers using Atera to study rare glioblastoma samples, and researchers who used Atera to study how colorectal cancers interact with the immune microenvironment. *See* https://www.prnewswire.com/news-releases/10x-genomics-introduces-atera-a-new-platform-to-redefine-how-biology-is-measured-and-understood-302746542.html; https://www.genengnews.com/topics/omics/10x-genomics-unveils-atera-spatial-platform-at-aacr-meeting/.

### C.     Element's Infringing AVITI24 Platform and Technology Access Program

20.     Element was founded in 2017 with the stated goal of "innovat[ing] in the market for short-read NGS [next-generation sequencing] instruments." *Element Biosciences, Inc. v. Illumina, Inc.*, No. 5:25-cv-08026-NW, Dkt. 1, ¶ 4 (N.D. Cal. September 22, 2025). Element announced the commercial launch of its AVITI benchtop NGS sequencer in April 2022. *See* "MEDIA ALERT: Element Biosciences to Unveil its AVITI™ System at 'Sequencing Reimagined' Virtual Event on March 14, 2022," dated March 7, 2022 available at https://www.businesswire.com/news/home/20220307005093/en/MEDIA-ALERT-Element-Biosciences-to-Unveil-its-AVITI-System-at-Sequencing-Reimagined-Virtual-Event-on-March-14-2022. Element claims "AVITI™ is a benchtop sequencing instrument with reimagined core technology to deliver flexibility and affordability while setting the standard for data quality." *See* https://www.elementbiosciences.com/products/aviti.

21.     In 2024, well over a year after 10x Genomics launched its Xenium platform, Element pivoted from NGS sequencers and announced pre-orders for its AVITI24 platform, which promised "examination of DNA, RNA, proteins, phosphoproteins, and cell structure within single

7

cells." *See* https://www.elementbiosciences.com/news/element-biosciences-announces-availability-of-aviti24-the-first-benchtop-sequencer-capable-of-direct-cell-profiling, dated April 5, 2024. In February 2026, at the Advances in Genome Biology and Technology ("AGBT") conference, Element announced that its AVITI24 platform would include updated capabilities, including sequencing in fresh frozen and FFPE tissues. *See* https://www.genomeweb.com/sequencing/element-biosciences-unveils-high-throughput-sequencing-platform; https://www.elementbiosciences.com/2026-innovation-roadmap:



## Tissue profiling on AVITI24

### Spatial sequencing without fragmented workflows

Traditional spatial profiling relies on multiple assays, each offering only part of the story. In 2026, AVITI24 brings Direct In Sample Sequencing to tissue. Built for FFPE and fresh frozen samples, researchers can preserve spatial context while directly linking expressed variant detection to cell state and tissue architecture.

By contrast, 10x's Xenium product included fresh frozen and FFPE tissue capabilities at the time it was introduced in 2022. *See* https://www.prnewswire.com/news-releases/10x-genomics-commercially-launches-xenium-platform-for-in-situ-analysis-301698748.html.

22. Element advertises, offers for sale, and now sells, ships, and installs the AVITI24 platform with its Teton chemistry to and for customers in the United States. *See* https://www.elementbiosciences.com/products/aviti24;

https://www.elementbiosciences.com/resources/webinar-on-demand-from-sample-to-insight-accelerating-discovery-with-direct-in-sample-sequencing-in-cells. Element's employees,

customers, collaborators, and partners have practiced and continue to practice (with Element's knowledge) one or more claims of the Harvard Patents by using the AVITI24 platform and Teton workflow. *See, e.g.*, Lopez, T, *et. al.*, "High-Throughput Multiomics Profiling of Model Systems Using the AVITI24 Platform" at https://www.biorxiv.org/content/10.1101/2025. 05.03.651997v1; *see also* https://www.elementbiosciences.com/publications.

23.    Through Element's Technology Access Program ("AVITI24 TAP"), Element offers to its customers an "in situ multiomics and next generation sequencing" service using its AVITI24 platform. *See* https://www.elementbiosciences.com/technology-access-program. Element practices the Harvard Patents by using the AVITI24 platform on behalf of its own scientists and researchers and for its AVITI24 TAP customers. Through the AVITI24 TAP, customers submit samples to Element. Element practices the Harvard Patents by analyzing the samples using the Teton workflow on the AVITI24 platform. Element provides customers with the raw data and analyzed results. *See* https://www.elementbiosciences.com/technology-access-program.

24.    The "Accused Instrumentalities" are all products, components, and services that are made, used, performed, offered for sale, sold, imported into the United States and/or supplied from the United States by or on behalf of Element in connection with Element's AVITI24 platform and workflow and/or Element's AVITI24 Technology Access Program. The Accused Instrumentalities include, for example and without limitation, instruments, software, reagents and consumables used by or provided by Element in connection with its AVITI24 platform and Teton chemistry.

**D.    The Harvard Patents**

25.    Through the development and subsequent making, using, selling, offering for sale, and/or importing of the Accused Instrumentalities, Element has and continues to infringe the Harvard Patents:

(a)    U.S. Patent No. 11,021,737, entitled "Compositions and Methods For Analyte Detection" (Ex. 1); and

(b)    U.S. Patent No. 11,566,276, entitled "Compositions and Methods For Analyte Detection" (Ex. 2).

(c)    U.S. Patent No. 11,566,277, entitled "Compositions and Methods For Analyte Detection" (Ex. 3).

(d)    U.S. Patent No. 12,264,358, entitled "Method of Selectively Sequencing Amplicons in a Biological Sample" (Ex. 4).

### 1.    The 737 Patent

26.    The 737 Patent was duly and legally issued on June 1, 2021, by the United States Patent and Trademark Office. U.S. Application No. 16/941,585, which issued as the 737 Patent, claims the benefit of Application No. PCT/US2012/071398, filed on December 21, 2012; Provisional Application No. 61/777,383, filed on March 12, 2013; and Provisional Application No. 61/579,265, filed on December 22, 2011. George M. Church, Je-hyuk Lee, Daniel Levner, and Michael Super are named inventors on the face of the 737 Patent.

27.    Harvard is the sole legal owner of the 737 Patent. A true and correct copy of the assignment abstract and record of the 737 Patent is attached as Exhibit 5. The 737 Patent is exclusively licensed to 10x, including *inter alia* the right to sue Element for its acts of infringement and to recover damages therefrom.

28.    Claims 1 and 24 are the only independent claims of the 737 Patent. Claim 1 recites:

1. A method for identifying an analyte, comprising:

(a) contacting a cell or tissue sample comprising said analyte with a detection reagent, wherein said detection reagent comprises (i) a probe that binds to said analyte and (ii) a nucleic acid label comprising one or more pre-determined subsequences;

(b) detecting a temporal order of signal signatures in said cell or tissue sample, wherein said temporal order of signal signatures is associated with said one or more pre-determined subsequences; and

(c) using said temporal order of signal signatures to identify said analyte in said cell

10

or tissue sample.

29.     The 737 Patent claims are directed to concrete, unconventional new laboratory methods for multiplex detection of analytes in cell and tissue samples by contacting the cell or tissue sample with "detection reagents." As the 737 Patent explains, the number of analytes that could be simultaneously detected (multiplexed) utilizing traditional fluorescence in-situ hybridization (FISH) technologies were "limited to the number of colors available to the microscopy." 737 Patent at 64:29-30. The patent explains that scientists could not overcome the limited number of colors for FISH by simply performing successive hybridization steps between probes and target analyte because this approach would require "multiple lengthy probe incubations and damaging stripping steps." 737 Patent at 27:45-46; *see also id.* at 64:9-14 ("While very common, immunohistochemistry is typically limited to probing with a small set of antibodies at a time (due to the limitation of available optical colors), and multiple staining cycles are generally avoided, since the stripping of the preceding cycle's antibodies can damage the sample"), *id.* at 64:39-43 ("Using some embodiments of the detection reagents and/or methods described herein, the assay can capture and probe numerous mRNA and/or miRNA at once, reducing and/or eliminating potentially harmful stripping steps.").

30.     The patent further describes how various prior art methods sought to overcome the limited number of colors using alternative strategies but each suffered from various challenges, including that a nanostring technology "generally requires very high optical magnification for spatially discerning separation of colors that are typically located very close to each other within a nanostring; thus limiting a field of view/sample size, and precision, and/or increasing instrument cost" (737 Patent at 9:52-56). Other problems included "too few probes would yield a signal that is difficult to be detected" or "probes overlapping, and thus making the readout impossible" (optical crowding). 737 Patent at 9:59-62. Thus the 737 Patent sought to "significantly increase

the number of different probes (and corresponding analytes) that can be simultaneously detected in a multiplex assay, as compared to an [sic] traditional assay where each probe is labeled with only fluorescent labels or quantum dots." 737 Patent at 19:58-62.

31.     The 737 Patent addresses this need by claiming and teaching, *inter alia*, the use of a novel detection reagent that never existed in nature and its use in an unconventional method that allows for temporal detection. The 737 specification describes the general temporal method:

> The method described herein comprises: (a) contacting the sample with a plurality of detection reagents as described herein, wherein each subpopulation of the detection reagents can target at least one different analyte; and (b) detecting in a temporally-sequential manner said plurality of the pre-determined subsequences of said detection reagents, wherein said detection of the subsequences each generates a signal signature corresponding to said subsequence, and wherein a temporal order of the signal signatures corresponding to said plurality of the subsequences of said detection reagent identifies a subpopulation of the detection reagents. In some embodiments, the temporal order of the signal signatures corresponding to said plurality of the subsequences of said detection reagent can be unique for each subpopulation of the detection reagents.

737 Patent at 4:31-45.

32.     The specification also describes the general structure of the detection reagent:

> Embodiments provided herein are based on, at least in part, the development of a multiplexed biological assay and readout, in which a multitude of detection reagents comprising one or more probes and/or probe types are applied to a sample, allowing the detection reagents to bind target molecules or analytes, which can then be optically identified in a temporally-sequential manner.

737 Patent at 3:59-65.

> The detection reagent comprises at least one probe reagent and at least one nucleic acid label, wherein said at least one nucleic acid label comprises at least one pre-determined subsequence to be detected in a temporally-sequential manner; wherein said at least one pre-determined subsequence forms an identifier of said at least one probe reagent; and wherein said at least one probe reagent and said at least one nucleic acid label are conjugated together.

737 Patent at 6:52-59, 29:37-45.

33. The claimed detection reagent is engineered and not found in nature. *See, e.g.*, 737 Patent at 47:33-53:30 ("Conjugation Between a Nucleic Acid Label and a Probe Reagent"), *id.* at 40:6-14 ("In some embodiments, instead of pre-forming the detection reagents comprising the circular nucleic acid label(s) and the probe reagent(s), detection reagents comprising linear polynucleotide(s) and the probe reagent(s) can be first synthesized. The circular nucleic acid labels can then [be] added to hybridize with the linear polynucleotide(s) before or after the probe reagent(s) bind to the analytes.").

34. The specification describes how the use of the detection reagent (which allows for temporal detection that allows for increased multiplexing) was not "limited by the number of available and practically usable colors." The specification explains that detection through the use of a detection reagent with a predetermined sequence enabled barcoding and correspondingly the number of analytes to be simultaneously analyzed:

> Described herein are methods, detection reagents (or detection molecules as used interchangeably herein) and kits for detecting a plurality of analytes in a sample. In accordance with embodiments of various aspects described herein, a probe reagent (e.g., antibody or aptamers) can be directly or indirectly labeled with a nucleic acid label. The nucleic acid information present on the nucleic acid label can then be decoded and/or detected in a temporally-sequential manner. The detection reagents and methods described herein significantly increase the number of different probes (and corresponding analytes) that can be simultaneously detected in a multiplex assay, as compared to an [sic] traditional assay where each probe is labeled with only fluorescent labels or quantum dots, and thus multiplexing is limited by the number of available and practically usable colors. Furthermore, because the detection reagents described herein are detected and/or imaged in a temporal series of steps, the number of probes (and corresponding analytes) that can be detected in a multiplex assay grows multiplicatively with the number of detection steps in a time series and the number of optical labels being used. By way of example only, 3 set [sic] of images in which 4 distinct optical labels are used can encode $4 \times 4 \times 4 = 64$ distinct probe reagents (e.g., antibodies).

737 Patent at 19:49-20:4.

35. The use of the engineered detection reagent in the claimed methods overcomes drawbacks of conventional FISH. The detection reagent remains bound and avoids "multiple

lengthy probe incubations and damaging stripping steps" (737 Patent at 27:45-46), like in FISH. Additionally, unlike with conventional FISH where one fluorophore is associated with the analyte, the claimed methods use temporal detection to detect a barcode associated with the predetermined subsequence portion of the detection reagent and the analyte.

36.    The written description of the 737 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of ordinary skill in the art to understand what those limitations cover and therefore what was claimed. The claimed combinations were not well-understood, routine, and conventional to one of ordinary skill in the art at the time of the invention. The methods covered by the claims of the 737 Patent, therefore, differ markedly from what has been performed in the industry prior to the inventions of the 737 Patent.

37.    The combination of elements in the claimed methods of the 737 Patent was not well-understood, routine, and conventional to one of ordinary skill in the art at the time of the invention. The claimed combination was innovative instead of well-understood, routine, and conventional because "[u]sing some embodiments of the detection reagents and/or methods described herein, the cells can be probed for many sequences simultaneously, thus allowing the user to save time and sample material, extract more data, and demand less prior knowledge of the sample" instead of "other fluorescence-based techniques, [like] FISH [that are] limited to the number of colors available to the microscopy." 737 Patent at 64:28-35. The methods covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lack these features. "[B]ecause the detection reagents described herein are detected and/or imaged in a temporal series of steps, the number of probes (and corresponding analytes) that can be detected in a multiplex assay grows multiplicatively with the number of detection steps in a time series and the number of optical labels being used," 737 Patent at 19:64-

20:2, the claims are directed to a specific, unconventional innovation to multiplex detection of analytes in cell and tissue samples.

38.     The methods of the 737 Patent claims are practiced by 10x's Xenium and Atera platforms.

39.     Dependent claims of the 737 Patent are further directed to specific improvements to multiplex detection of analytes in cell and tissue samples. The additional unconventional methods include sequencing the one or more pre-determined subsequence (Claim 5), when sequencing is sequencing-by-synthesis (Claim 6), and when the analyte is a ribonucleic acid (RNA) molecule (Claim 11).

### 2.     The 276 Patent

40.     The 276 Patent was duly and legally issued on January 21, 2023, by the United States Patent and Trademark Office. U.S. Application No. 17/366,151, which was issued as the 276 Patent, claims the benefit of Application No. PCT/US2012/071398, filed on December 21, 2012; Provisional Application No. 61/579,265, filed on December 22, 2011; and Provisional Application No. 61/777,383, filed on March 12, 2013. George M. Church, Jehyuk Lee, Daniel Levner, and Michael Super are named inventors on the face of the 276 Patent.

41.     Harvard is the sole and legal owner of the 276 Patent. A true and correct copy of the assignment abstract and record of the 276 Patent is attached as Exhibit 6. The 276 Patent is exclusively licensed to 10x, including *inter alia* the right to sue Element for its acts of infringement and to recover damages therefrom.

42.     Claims 1, 9, and 26 are the only independent claims of the 276 Patent. Claim 1 recites:

1. A method for biological analysis, comprising:

(a) providing a biological sample comprising a plurality of cells, wherein a cell of

said plurality of cells comprises a first analyte and a second analyte;

(b) contacting said biological sample with a first detection reagent and a second detection reagent to bind said first detection reagent to said first analyte and said second detection reagent to said second analyte,

wherein said first detection reagent comprises (i) a first probe that binds to said first analyte and (ii) a first one or more predetermined sequences, and

wherein said second detection reagent comprises (i) a second probe that binds to said second analyte and (ii) a second one or more predetermined sequences, and

wherein at least one predetermined sequence of said second one or more predetermined sequences is different than at least one predetermined sequence of said first one or more predetermined sequences;

(c) detecting, in a temporally sequential manner: (i) said first one or more predetermined sequences to obtain a first temporal order of signal signatures indicative of said first analyte and (ii) said second one or more predetermined sequences to obtain a second temporal order of signal signatures indicative of said second analyte;

(d) using said first temporal order of signal signatures to identify said first analyte and using said second temporal order of signal signatures to identify said second analyte; and

(e) using a location of said first temporal order of signal signatures and a location of said second temporal order of signal signatures to determine that said first analyte and said second analyte are both located in said cell.

43.    The 276 Patent claims are directed to concrete, unconventional new laboratory methods for multiplex detection of analytes in biological samples by contacting the biological sample with "detection reagents." As the 276 Patent explains, the number of analytes that could be simultaneously detected (multiplexed) utilizing traditional fluorescence in situ hybridization (FISH) technologies were "limited to the number of colors available to the microscopy." 276 Patent at 65:14-15. The patent explains that scientists could not overcome the limited number of colors for FISH by simply performing successive hybridization steps between probes and target analyte because this approach would require "multiple lengthy probe incubations and damaging stripping steps." 276 Patent at 27:45-46; *see also id.* at 64:61-66 ("While very common,

16

immunohistochemistry is typically limited to probing with a small set of antibodies at a time (due to the limitation of available optical colors), and multiple staining cycles are generally avoided, since the stripping of the preceding cycle's antibodies can damage the sample"), *id.* at 65:24-28 ("Using some embodiments of the detection reagents and/or methods described herein, the assay can capture and probe numerous mRNA and/or miRNA at once, reducing and/or eliminating potentially harmful stripping steps.").

44. The patent further describes how various prior art methods sought to overcome the limited number of colors using alternative strategies but each suffered from various challenges, including that a nanostring technology "generally requires very high optical magnification for spatially discerning separation of colors that are typically located very close to each other within a nanostring; thus limiting a field of view/sample size, and precision, and/or increasing instrument cost" (276 Patent at 9:52-56). Other problems included "too few probes would yield a signal that is difficult to be detected" or "probes overlapping, and thus making the readout impossible" (optical crowding). 276 Patent at 9:59-62. Thus the 276 Patent sought to "significantly increase the number of different probes (and corresponding analytes) that can be simultaneously detected in a multiplex assay, as compared to an [sic] traditional assay where each probe is labeled with only fluorescent labels or quantum dots." 276 Patent at 19:57-61.

45. The 276 Patent addresses this need by claiming and teaching, *inter alia*, the use of a novel detection reagent that never existed in nature and its use in an unconventional method that allows for temporal detection. The 276 specification describes the general temporal method:

> The method described herein comprises: (a) contacting the sample with a plurality of detection reagents as described herein, wherein each subpopulation of the detection reagents can target at least one different analyte; and (b) detecting in a temporally-sequential manner said plurality of the pre-determined subsequences of said detection reagents, wherein said detection of the subsequences each generates a signal signature corresponding to said subsequence, and wherein a temporal order

17

of the signal signatures corresponding to said plurality of the subsequences of said detection reagent identifies a subpopulation of the detection reagents. In some embodiments, the temporal order of the signal signatures corresponding to said plurality of the subsequences of said detection reagent can be unique for each subpopulation of the detection reagents.

276 Patent at 4:36-50.

46.     The specification also describes the general structure of the detection reagent:

Embodiments provided herein are based on, at least in part, the development of a multiplexed biological assay and readout, in which a multitude of detection reagents comprising one or more probes and/or probe types are applied to a sample, allowing the detection reagents to bind target molecules or analytes, which can then be optically identified in a temporally-sequential manner.

276 Patent at 3:64-4:3.

The detection reagent comprises at least one probe reagent and at least one nucleic acid label, wherein said at least one nucleic acid label comprises at least one pre-determined subsequence to be detected in a temporally-sequential manner; wherein said at least one pre-determined subsequence forms an identifier of said at least one probe reagent; and wherein said at least one probe reagent and said at least one nucleic acid label are conjugated together.

276 Patent at 6:57-64, 29:37-45.

47.     The claimed detection reagent is engineered and not found in nature. *See, e.g.*, 276 Patent at 48:16-54:15 ("Conjugation Between a Nucleic Acid Label and a Probe Reagent"), *id.* at 40:3-11 ("In some embodiments, instead of pre-forming the detection reagents comprising the circular nucleic acid label(s) and the probe reagent(s), detection reagents comprising linear polynucleotide(s) and the probe reagent(s) can be first synthesized. The circular nucleic acid labels can then [be] added to hybridize with the linear polynucleotide(s) before or after the probe reagent(s) bind to the analytes.").

48.     The specification describes how the use of the detection reagent (which allows for temporal detection that allows for increased multiplexing) was not "limited by the number of available and practically usable colors." The specification explains that detection through the use

18

of a detection reagent with a predetermined sequence enabled barcoding and correspondingly the number of analytes to be simultaneously analyzed:

> Described herein are methods, detection reagents (or detection molecules as used interchangeably herein) and kits for detecting a plurality of analytes in a sample. In accordance with embodiments of various aspects described herein, a probe reagent (e.g., antibody or aptamers) can be directly or indirectly labeled with a nucleic acid label. The nucleic acid information present on the nucleic acid label can then be decoded and/or detected in a temporally-sequential manner. The detection reagents and methods described herein significantly increase the number of different probes (and corresponding analytes) that can be simultaneously detected in a multiplex assay, as compared to an [sic] traditional assay where each probe is labeled with only fluorescent labels or quantum dots, and thus multiplexing is limited by the number of available and practically usable colors. Furthermore, because the detection reagents described herein are detected and/or imaged in a temporal series of steps, the number of probes (and corresponding analytes) that can be detected in a multiplex assay grows multiplicatively with the number of detection steps in a time series and the number of optical labels being used. By way of example only, 3 set [sic] of images in which 4 distinct optical labels are used can encode $4 \times 4 \times 4 = 64$ distinct probe reagents (e.g., antibodies).

276 Patent at 19:48-20:3.

49.     The use of the engineered detection reagent in the claimed methods overcomes drawbacks of conventional FISH. The detection reagent remains bound and avoids "multiple lengthy probe incubations and damaging stripping steps" (276 Patent at 27:45-46), like in FISH. Additionally, unlike with conventional FISH where one fluorophore is associated with the analyte, the claimed methods use temporal detection to detect a barcode associated with the predetermined subsequence portion of the detection reagent and the analyte.

50.     The written description of the 276 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of ordinary skill in the art to understand what those limitations cover and therefore what was claimed. The claimed combinations were not well-understood, routine, and conventional to one of ordinary skill in the art at the time of the invention. The methods covered by the claims of the 276 Patent, therefore, differ markedly from what has been performed in the industry prior to the inventions of the 276 Patent.

51. The combination of elements in the claimed methods of the 276 Patent was not well-understood, routine, and conventional to one of ordinary skill in the art at the time of the invention. The claimed combination was innovative instead of well-understood, routine, and conventional because "[u]sing some embodiments of the detection reagents and/or methods described herein, the cells can be probed for many sequences simultaneously, thus allowing the user to save time and sample material, extract more data, and demand less prior knowledge of the sample" instead of "other fluorescence-based techniques, [like] FISH [that are] limited to the number of colors available to the microscopy." 276 Patent at 65:13-20. The methods covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lack these features. "[B]ecause the detection reagents described herein are detected and/or imaged in a temporal series of steps, the number of probes (and corresponding analytes) that can be detected in a multiplex assay grows multiplicatively with the number of detection steps in a time series and the number of optical labels being used," 276 Patent at 19:63-20:1, the claims are directed to a specific, unconventional innovation in multiplex detection of analytes in biological samples.

52. The methods of the 276 Patent claims are practiced by 10x's Xenium and Atera platforms.

53. Dependent claims of the 276 Patent are further directed to specific improvements to multiplex detection of analytes in biological samples. The additional unconventional methods include when the first and second analytes are messenger RNA molecules (Claim 5) and when the first and second analytes are protein molecules and the first and second probes include a first and a second antibody (Claim 7).

20

### 3.    The 277 Patent

54.    The 277 Patent was duly and legally issued on January 31, 2023, by the United States Patent and Trademark Office. U.S. Application No. 17/671,803, which was issued as the 277 Patent, claims the benefit of Application No. PCT/US2014/018580, filed on February 26, 2014; and Provisional Application No. 61/579,265, filed on December 22, 2011. George M. Church, Jehyuk Lee, Daniel Levner, and Michael Super are named inventors on the face of the 277 Patent.

55.    Harvard is the sole and legal owner of the 277 Patent. A true and correct copy of the assignment abstract and record of the 277 Patent is attached as Exhibit 7. The 277 Patent is exclusively licensed to 10x, including *inter alia* the right to sue Element for its acts of infringement and to recover damages therefrom.

56.    Claims 1, 8, 15, and 18 are the only independent claims of the 277 Patent. Claim 1 recites:

1. A method, comprising:

(a) binding one or more detection reagents to an analyte at a spatial location in a cell or tissue sample, wherein a detection reagent of said one or more detection reagents comprises: (1) a probe that binds to said analyte and (2) one or more predetermined sequences;

(b) using imaging to detect, in a temporally sequential manner, said one or more detection reagents bound to said analyte at said spatial location, thereby obtaining a plurality of images comprising a plurality of detected signal signatures associated with said analyte at said spatial location;

(c) using at least one distinguishable feature common to images of said plurality of images to obtain a plurality of aligned images comprising said plurality of detected signal signatures; and

(d) using a temporal order of said plurality of detected signal signatures of said plurality of aligned images to identify said analyte at said spatial location.

57.     The 277 Patent claims are directed to concrete, unconventional new laboratory methods for multiplex detection of analytes in cell and tissue samples by binding "detection reagents" to the cell or tissue sample. As the 277 Patent explains, the number of analytes that could be simultaneously detected (multiplexed) utilizing traditional fluorescence in-situ hybridization (FISH) technologies were "limited to the number of colors available to the microscopy." 277 Patent at 64:56-57. The patent explains that scientists could not overcome the limited number of colors for FISH by simply performing successive hybridization steps between probes and target analyte because this approach would require "multiple lengthy probe incubations and damaging stripping steps." 277 Patent at 27:46-47; *see also id.* at 64:37-42 ("While very common, immunohistochemistry is typically limited to probing with a small set of antibodies at a time (due to the limitation of available optical colors), and multiple staining cycles are generally avoided, since the stripping of the preceding cycle's antibodies can damage the sample"), *id.* at 64:66-65:3 ("Using some embodiments of the detection reagents and/or methods described herein, the assay can capture and probe numerous mRNA and/or miRNA at once, reducing and/or eliminating potentially harmful stripping steps.").

58.     The patent further describes how various prior art methods sought to overcome the limited number of colors using alternative strategies but each suffered from various challenges, including that a nanostring technology "generally requires very high optical magnification for spatially discerning separation of colors that are typically located very close to each other within a nanostring; thus limiting a field of view/sample size, and precision, and/or increasing instrument cost." 277 Patent at 9:52-56. Other problems included "too few probes would yield a signal that is difficult to be detected" or "probes overlapping, and thus making the readout impossible" (optical crowding). 277 Patent at 9:59-62. Thus the 277 Patent sought to "significantly increase the number

of different probes (and corresponding analytes) that can be simultaneously detected in a multiplex assay, as compared to an [sic] traditional assay where each probe is labeled with only fluorescent labels or quantum dots." 277 Patent at 19:57-61.

59.    The 277 Patent addresses this need by claiming and teaching, *inter alia*, the use of a novel detection reagent that never existed in nature and its use in an unconventional method that allows for temporal detection. The 277 specification describes the general temporal method:

> The method described herein comprises: (a) contacting the sample with a plurality of detection reagents as described herein, wherein each subpopulation of the detection reagents can target at least one different analyte; and (b) detecting in a temporally-sequential manner said plurality of the pre-determined subsequences of said detection reagents, wherein said detection of the subsequences each generates a signal signature corresponding to said subsequence, and wherein a temporal order of the signal signatures corresponding to said plurality of the subsequences of said detection reagent identifies a subpopulation of the detection reagents. In some embodiments, the temporal order of the signal signatures corresponding to said plurality of the subsequences of said detection reagent can be unique for each subpopulation of the detection reagents.

277 Patent at 4:36-50.

60.    The specification also describes the general structure of the detection reagent:

> Embodiments provided herein are based on, at least in part, the development of a multiplexed biological assay and readout, in which a multitude of detection reagents comprising one or more probes and/or probe types are applied to a sample, allowing the detection reagents to bind target molecules or analytes, which can then be optically identified in a temporally-sequential manner.

277 Patent at 3:64-4:3.

> The detection reagent comprises at least one probe reagent and at least one nucleic acid label, wherein said at least one nucleic acid label comprises at least one pre-determined subsequence to be detected in a temporally-sequential manner; wherein said at least one pre-determined subsequence forms an identifier of said at least one probe reagent; and wherein said at least one probe reagent and said at least one nucleic acid label are conjugated together.

277 Patent at 6:57-64, 29:38-46.

61.    The claimed detection reagent is engineered and not found in nature. *See, e.g.*, 277 Patent at 47:61-53:60 ("Conjugation Between a Nucleic Acid Label and a Probe Reagent"), *id.* at 39:66-40:6 ("In some embodiments, instead of pre-forming the detection reagents comprising the circular nucleic acid label(s) and the probe reagent(s), detection reagents comprising linear polynucleotide(s) and the probe reagent(s) can be first synthesized. The circular nucleic acid labels can then added to hybridize with the linear polynucleotide(s) before or after the probe reagent(s) bind to the analytes.").

62.    The specification describes how the use of the detection reagent (which allows for temporal detection that allows for increased multiplexing) was not "limited by the number of available and practically usable colors." The specification explains that detection through the use of a detection reagent with a predetermined sequence enabled barcoding and correspondingly the number of analytes to be simultaneously analyzed:

> Described herein are methods, detection reagents (or detection molecules as used interchangeably herein) and kits for detecting a plurality of analytes in a sample. In accordance with embodiments of various aspects described herein, a probe reagent (e.g., antibody or aptamers) can be directly or indirectly labeled with a nucleic acid label. The nucleic acid information present on the nucleic acid label can then be decoded and/or detected in a temporally-sequential manner. The detection reagents and methods described herein significantly increase the number of different probes (and corresponding analytes) that can be simultaneously detected in a multiplex assay, as compared to an [sic] traditional assay where each probe is labeled with only fluorescent labels or quantum dots, and thus multiplexing is limited by the number of available and practically usable colors. Furthermore, because the detection reagents described herein are detected and/or imaged in a temporal series of steps, the number of probes (and corresponding analytes) that can be detected in a multiplex assay grows multiplicatively with the number of detection steps in a time series and the number of optical labels being used. By way of example only, 3 set [sic] of images in which 4 distinct optical labels are used can encode $4 \times 4 \times 4 = 64$ distinct probe reagents (e.g., antibodies).

277 Patent at 19:48-20:3.

63.    The use of the engineered detection reagent in the claimed methods overcomes drawbacks of conventional FISH. The detection reagent remains bound and avoids "multiple

24

lengthy probe incubations and damaging stripping steps" (277 Patent at 27:46-47), like in FISH. Additionally, unlike with conventional FISH where one fluorophore is associated with the analyte, the claimed methods use temporal detection to detect a barcode associated with the predetermined subsequence portion of the detection reagent and the analyte.

64.     The written description of the 277 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of ordinary skill in the art to understand what those limitations cover and therefore what was claimed. The claimed combinations were not well-understood, routine, and conventional to one of ordinary skill in the art at the time of the invention. The methods covered by the claims of the 277 Patent, therefore, differ markedly from what has been performed in the industry prior to the inventions of the 277 Patent.

65.     The combination of elements in the claimed methods of the 277 Patent was not well-understood, routine, and conventional to one of ordinary skill in the art at the time of the invention. The claimed combination was innovative instead of well-understood, routine, and conventional because "[u]sing some embodiments of the detection reagents and/or methods described herein, the cells can be probed for many sequences simultaneously, thus allowing the user to save time and sample material, extract more data, and demand less prior knowledge of the sample" instead of "other fluorescence-based techniques, [like] FISH [that are] limited to the number of colors available to the microscopy." 277 Patent at 64:56-62. The methods covered by the asserted claims, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lack these features. "[B]ecause the detection reagents described herein are detected and/or imaged in a temporal series of steps, the number of probes (and corresponding analytes) that can be detected in a multiplex assay grows multiplicatively with the number of detection steps in a time series and the number of optical labels being used," 277 Patent at 19:63-

25

20:1, the claims are directed to a specific, unconventional innovation in multiplex detection of analytes in cell and tissue samples.

66.     The methods of the 277 Patent claims are practiced by 10x's Xenium and Atera platforms.

67.     Dependent claims of the 277 Patent are further directed to specific improvements to multiplex detection of analytes in cell and tissue samples. The additional unconventional methods include when the plurality of images includes, *inter alia*, using at least one distinguishable feature to align a first registered location and a second registered location, thereby obtaining aligned images of said plurality of aligned images (Claim 2); when the analyte is a nucleic acid and when one or more of the detection reagents is a nucleic acid molecule comprising a probe that includes a sequence complementary to at least a portion of the nucleic acid analyte and one more predetermined sequences (Claim 3); and when the analyte is a protein analyte and the probe includes an antibody that is conjugated to one more predetermined sequences (Claim 5).

### 4.     The 358 Patent

68.     The 358 Patent was duly and legally issued on April 1, 2025, by the United States Patent and Trademark Office. U.S. Application No. 18/652,923, which was issued as the 358 Patent, claims the benefit of the Application No. PCT/US2014/018580, filed on February 26, 2014; and Provisional Application No. 61/777,683, filed on March 12, 2013. George M. Church, Jehyuk Lee, Richard C. Terry and Evan R. Daugharthy are named inventors on the face of the 358 Patent.

69.     Harvard is the sole and legal owner of the 358 Patent. A true and correct copy of the assignment abstract and record of the 358 Patent is attached as Exhibit 8. The 358 Patent is exclusively licensed to 10x, including *inter alia* the right to sue Element for its acts of infringement and to recover damages therefrom.

70.     Claims 1 and 19 are the only independent claims of the 358 Patent. Claim 1 recites:

1. A method, comprising,

(a) providing a biological sample comprising a plurality of cells comprising a plurality of ribonucleic acid (RNA) molecules;

(b) generating a plurality of circularized nucleic acid molecules in said biological sample, wherein each of said plurality of circularized nucleic acid molecules comprises a nucleic acid sequence corresponding to a sequence of an RNA molecule of said plurality of RNA molecules;

(c) amplifying circularized nucleic acid molecules of said plurality of circularized nucleic acid molecules in a rolling circle amplification reaction to generate a plurality of amplicons in said biological sample; and

(d) using selective sequencing primers to sequence different subsets of said plurality of amplicons in said biological sample.

71.     The 358 Patent claims are directed to concrete, unconventional methods for sequencing RNA molecules in cell or tissue samples by generating circularized RNA molecules of RNA molecules in a biological sample, amplifying the circularized RNA molecules to generate amplicons, and then using selective sequencing primers to sequence different subsets of the amplicons at a time. The RNA undergoes many transformative steps including circularization, amplifications, and sequencing. The amplicons that are sequenced are not found in nature. The sequencing primers are engineered and do not exist in nature.

72.     The combination of elements in the claimed method of the 358 Patent was not well-understood, routine, and conventional. As the patent explains, for imaging analytes in a cell or tissue sample, obtaining sufficiently bright images without generating overlapping signals was challenging. The specification states that "the nucleic acids are amplified to an extent to produce sufficient levels of amplicons for three dimensional imaging," and that "the nucleic acids are amplified and include a label sufficient for a high level of fluorescence compatible with three dimensional imaging." 358 Patent at 3:28-30. However, "[g]iven the tight packing density," there is a need to "reduc[e] the density of information read at any given time and extending over time

27

for better spatial resolution." 358 Patent at 13:67-14:3. The claimed solution is to "selectively read different subpopulations sequentially" (358 Patent at 13:67-14:1) by "[u]sing selective sequencing primers, [so] only a subset of the total amplicons can be sequenced for better spatial resolution." 358 Patent at 20:47-49.

73.   The combination of elements in the claimed methods was not well-understood, routine, and conventional to one of ordinary skill in the art at the time of the invention. By first generating a circularized molecule so that rolling circle amplification could be performed to generate amplicons in combination with the use of a selective sequencing primer such that the analytes in the cell or tissue sample would be sufficiently bright without overlapping signals was not well-understood, routine, and conventional. The written description of the 358 Patent describes, in technical detail, each of the limitations in the claims, allowing a person of skill in the art to understand what those limitations cover, and therefore what was claimed. The compositions and methods covered by the claims of the 358 Patent, therefore, differ markedly from the prior systems in use at the time of this invention, which, *inter alia*, lacked these features.

74.   Dependent claims of the 358 Patent are further directed to specific, unconventional improvements to sequencing in cell or tissue samples. These additional unconventional combinations include sequencing by synthesis (Claim 15) and using at least sixteen different selective sequencing primers (Claim 18).

**COUNT I: Infringement of U.S. Patent No. 11,021,737**

75.   Plaintiffs incorporate and reallege paragraphs 1 – 74 above as if fully set forth herein.

76.   Element has infringed and continues to infringe one or more claims of the 737 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making and/or using, offering to sell, selling, and/or importing into the United States without authority the

28

Accused Instrumentalities and/or components thereof. Attachment A provides an exemplary infringement claim chart for one asserted claim and exemplary and/or representative Accused Instrumentalities.

77.    On information and belief, Element was aware of or acted with willful blindness to the existence of the 737 Patent and the infringement of the 737 Patent by itself and third parties, including without limitation users, customers, affiliates, parents, subsidiaries, third parties, importers, and/or sellers. Element knew, should have known, or was willfully blind to the existence of the 737 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 737 Patent.  *First*, 10x asserted the 737 Patent in two other litigations involving platforms for analysis of analytes in cell or tissue samples. *See 10x Genomics, Inc. v. NanoString Technologies, Inc.*, 1:22-cv-00261-MFK (D. Del.) ("NanoString-261 Case") and *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK (D. Del.) ("Vizgen-595 Case"). Both the NanoString-261 and Vizgen-595 Cases were widely known in spatial biology. *See, e.g.*, Andrew P. Han, 10x Genomics Sues NanoString, Vizgen Over Spatial Gene Expression Analysis Technologies, GenomeWeb, May 10, 2022, available at https://www.genomeweb.com/business-news/10x-genomics-sues-nanostring-vizgen-over-spatial-gene-expression-analysis. *Second*, on November 28, 2023, or shortly thereafter, 10x had served a document subpoena on Element in both cases. *See, e.g.*, *10x Genomics, Inc. v. NanoString Technologies, Inc.*, 1:22-cv-00261-MFK, D.I. 214, Exhibit 6 (D. Del. Nov. 28, 2023). 10x subsequently served a deposition subpoena on Element on April 10, 2024. *See, e.g.*, *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 407, Exhibit 5 (D. Del.  Apr. 9, 2024). On information and belief, by November 28, 2023 or shortly thereafter, Element had knowledge of or was willfully blind to the existence of the 737 Patent. *Third*, in the NanoString Case, 10x had also asserted a parent patent to the 737 Patent (U.S. Patent

29

No. 10,227,639 ("the 639 Patent")), and the European counterpart of the 639 patent (EP4108782) was at issue at the Unified Patent Court when 10x sought a preliminary injunction, which was highly publicized and well known in the genomics field as it was the first lawsuit filed in that Court. *See* "10x Genomics Files Two New Lawsuits Requesting Preliminary Injunctions Against NanoString's CosMx Products," PR Newswire, dated July 1, 2023, available at https://www.prnewswire.com/news-releases/10x-genomics-files-two-new-lawsuits-requesting-preliminary-injunctions-against-nanostrings-cosmx-products-301839927.html. ***Fourth***, on information and belief Element actively monitored the related patent families from the NanoString and Vizgen litigations and cited them during prosecution of Element patent applications, including US20210123098 at 6/6/2022 information disclosure statement by applicant; US20240052398 at 5/14/2024 information disclosure statement by applicant; and US20250349138A1 at 4/4/2025 information disclosure statement by applicant and 4/4/2025 citation of the 3/28/2024 international search report for PCT/US2023/076125. ***Fifth***, in the Vizgen-595 Case, on or before March 29, 2024, Vizgen disclosed Dr. Joseph Puglisi as an expert witness on validity issues, including the validity of the 737 Patent. 10x objected to the disclosure of 10x sensitive commercial information under the protective order based upon his position as Chairman of the Scientific Advisory Board of Element. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 390 (D. Del. Mar. 29, 2024) (sealed) and 401 (D. Del. Apr. 4, 2024) (redacted). Vizgen opposed the objection and told the Court "Dr. Puglisi signed Exhibit A to the [Protective Order], explicitly agreeing 'to be bound by and comply with the terms of the [PO].'" *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 395 at 1 (D. Del. Apr. 2, 2024). Therefore, at that time, Dr. Puglisi had knowledge of the 737 Patent at issue in the Vizgen-595 Case and had agreed to opine on its validity. On April 5, 2024, the Court sustained 10x's objection to releasing confidential information to Dr.

Puglisi based on his connection to Element Biosciences. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 400 (Apr. 5, 2024). ***Sixth***, in *10x Genomics, Inc. v. Curio Biosciences, Inc.*, 1:32-cv-01375-MN, Curio retained Dr. Puglisi as their sole technical expert. 10x's technical expert had put the patents asserted in the NanoString-261 and Vizgen-595 Cases at issue regarding technological comparability, and Dr. Puglisi as the sole technical expert for Defendants would have been the expert responsible for addressing them in response. Finally, Element has been aware of the 737 Patent and its infringement at least since May 7, 2026, when 10x notified Element by letter of the 737 Patent and its infringement, and at least since the filing and service of this Complaint.

78. Element, without authority and with knowledge of the 737 Patent, has actively induced and continues to actively induce infringement of one or more claims of the 737 Patent under 35 U.S.C. § 271(b) by making and selling the Accused Instrumentalities in the United States and intentionally instructing and otherwise encouraging others, including Element's customers and end users such as scientists working at laboratories that purchase the Accused Instrumentalities, to use the Accused Instrumentalities in the United States in a manner that infringes one or more claims of the 737 Patent including as described in Attachment A. Element's active inducement of others' infringement began no later than its first shipment and/or installation of the Accused Instrumentalities to one of its customers, end users, partners, or collaborators, which occurred no later than December 2024. *See* Element Biosciences Surpasses 50 AVITI24[TM] 5D Multiomic System Installations in Just Months, dated July 29, 2025, available at https://www.elementbiosciences.com/news/element-biosciences-surpasses-50-aviti24-5d-multiomic-system-installations-in-just-months. On information and belief, the first direct infringement of the 737 Patent by Element's employees, customers, end users, partners, or

31

collaborators occurred before May 10, 2025, the date of Element's publication that a team of employees had used the Accused Instrumentalities. *See* Vivien Dien, et al., Unraveling Tyrosine-Kinase Inhibitor Resistance in NSCLC Cells via Same-cell Measurement of RNA, Protein, and Morphological Responses, bioRxiv, dated May 10, 2025, available at https://www.biorxiv.org/content/10.1101/2025.05.06.652479v1. On information and belief, one or more of Element's customers and end users of the Accused Instrumentalities have directly infringed and continue to directly infringe the 737 Patent by using the Accused Instrumentalities in accordance with Element's instruction and encouragement. Element's instruction and encouragement include, for example, distributing the documentation cited in Attachment A, as well as user guides, sample and slide preparation manuals, training decks, and published articles. On information and belief, Element's instruction and encouragement further include, for example, on-site installation of AVITI24 instruments at customers' facilities, on-site training and repairs, phone and email support, instrument and software updates, and distribution of webinars and other training videos. Element provides this instruction and encouragement to its actual and prospective customers and end users with the knowledge and intent that doing so results in the infringement of one or more method claims of the 737 Patent by those customers and end users and/or in their performing each step of one or more methods recited in those claims. As explained below, on information and belief, Element acts knowingly and/or with willful blindness as to the existence of the 737 Patent and of its own infringement and the infringement by others as a result of the 10x-Vizgen Litigation, as well as the knowledge of Element's Scientific Advisory Board Member Dr. Joseph Puglisi.

79.     Element, since at least its first shipment or commercial installation of the AVITI24 platform on or around December 2024, has contributed and continues to contribute to the

infringement by others of one or more claims of the 737 Patent pursuant to 35 U.S.C. § 271(c) by importing, selling, and/or offering for sale in the United States without authority the Accused Instrumentalities and/or components thereof specifically so that the Accused Instrumentalities will be used in an infringing manner by others, including use as described in Attachment A by Element's customers and end users. *See* Element Biosciences Surpasses 50 AVITI24[TM] 5D Multiomic System Installations in Just Months, dated July 29, 2025, available at https://www.elementbiosciences.com/news/element-biosciences-surpasses-50-aviti24-5d-multiomic-system-installations-in-just-months; Vivien Dien, et al., Unraveling Tyrosine-Kinase Inhibitor Resistance in NSCLC Cells via Same-cell Measurement of RNA, Protein, and Morphological Responses, bioRxiv, dated May 10, 2025, available at https://www.biorxiv.org/content/10.1101/2025.05.06.652479v1. One or more of Element's customers and end users of the Accused Instrumentalities have directly infringed and continue to directly infringe the 737 Patent by using the Accused Instrumentalities in accordance with Element's instructions and encouragement. *Id.* The AVITI24 platform and Teton chemistry components, including specifically the instruments and reagents, were designed specifically to be used in a manner that infringes the asserted claims of the 737 Patent. Moreover, as shown in Element's instructional materials, there is no other substantial use for the AVITI24 platform with the Teton chemistry or its components. The instruments and reagents are a material part of the claimed inventions of the 737 Patent that result in infringement when used. As a result of Element's selling and/or offering for sale of the AVITI24 and its components, other entities on information and belief use these products for their intended purposes and according to Element's instructions and installation with the result that such entities, such as Element's customers and users of the Accused Instrumentalities, directly infringe the asserted claims of the 737 Patent, literally or under

the doctrine of equivalents, for the reasons stated above and in Attachment A. As explained below, on information and belief, Element acts knowingly and/or with willful blindness as to the existence of the 737 Patent and as to the fact that at least the AVITI24 instruments with Teton chemistry and reagents are especially made and adapted for use in an infringing manner, are not staple articles of commerce, and do not have non-infringing uses.

80. Plaintiffs have suffered and continue to suffer damages as a result of Element's infringement of the 737 Patent.

81. The infringement of the 737 Patent by Element has been, and continues to be, willful and deliberate. At least as of May 7, 2026, if not earlier, Element knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 737 Patent. Such conduct constitutes, at minimum, willful infringement of the 737 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

82. Unless Element is enjoined from infringing the 737 Patent, Element's efforts to design, develop, market, offer to sell, and sell the Accused Instrumentalities will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

## COUNT II: Infringement of U.S. Patent No. 11,566,276

83. Plaintiffs incorporate and reallege paragraphs 1 – 82 above as if fully set forth herein.

84. Element has infringed and continues to infringe one or more claims of the 276 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making and/or using, offering to sell, selling, and/or importing into the United States without authority the Accused Instrumentalities and/or components thereof. Attachment B provides an exemplary infringement claim chart for one asserted claim and exemplary and/or representative Accused Instrumentalities.

85.    Element knew, should have known, or was willfully blind to the existence of the 276 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 276 Patent.  ***First***, 10x asserted the parent patent to the 276 Patent (the 737 Patent) in two other litigations involving platforms for analysis of analytes in cell or tissue samples. *See 10x Genomics, Inc. v. NanoString Technologies, Inc.*, 1:22-cv-00261-MFK (D. Del.) ("NanoString-261 Case") and *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK (D. Del.) ("Vizgen-595 Case"). Both the NanoString-261 and Vizgen-595 Cases were widely known in spatial biology. *See, e.g.*, Andrew P. Han, 10x Genomics Sues NanoString, Vizgen Over Spatial Gene Expression Analysis Technologies, GenomeWeb, May 10, 2022, available at https://www.genomeweb.com/business-news/10x-genomics-sues-nanostring-vizgen-over-spatial-gene-expression-analysis. ***Second***, on November 28, 2023, or shortly thereafter, 10x had served a document subpoena on Element in both cases. *See, e.g.*, *10x Genomics, Inc. v. NanoString Technologies, Inc.*, 1:22-cv-00261-MFK, D.I. 214, Exhibit 6 (D. Del. Nov. 28, 2023). 10x subsequently served a deposition subpoena on Element on April 10, 2024. *See, e.g.*, *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 407, Exhibit 5 (D. Del. Apr. 9, 2024). On information and belief, by November 28, 2023 or shortly thereafter, Element had knowledge of or was willfully blind to the existence of the 276 patent. ***Third***, in the NanoString Case, 10x had also asserted a parent patent to the 276 Patent (U.S. Patent No. 10,227,639 ("the 639 Patent")), and the European counterpart of the 639 patent (EP4108782) was at issue at the Unified Patent Court when 10x sought a preliminary injunction, which was highly publicized and well known in the genomics field as it was the first lawsuit filed in that Court. *See* "10x Genomics Files Two New Lawsuits Requesting Preliminary Injunctions Against NanoString's CosMx Products," PR Newswire, dated July 1, 2023, available at https://www.prnewswire.com/news-releases/10x-genomics-files-two-

new-lawsuits-requesting-preliminary-injunctions-against-nanostrings-cosmx-products-301839927.html. **Fourth**, on information and belief Element actively monitored the related patent families from the NanoString and Vizgen litigations and cited them during prosecution of Element patent applications, including US20210123098 at 6/6/2022 information disclosure statement by applicant; US20240052398 at 5/14/2024 information disclosure statement by applicant; and US20250349138A1 at 4/4/2025 information disclosure statement by applicant and 4/4/2025 citation of the 3/28/2024 international search report for PCT/US2023/076125.   **Fifth**, in the Vizgen-595 Case, on or before March 29, 2024, Vizgen disclosed Dr. Joseph Puglisi as an expert witness on validity issues, including the validity of the parent 737 Patent. 10x objected to the disclosure of 10x sensitive commercial information under the protective order based upon his position as Chairman of the Scientific Advisory Board of Element. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 390 (D. Del. Mar. 29, 2024) (sealed) and 401 (D. Del. Apr. 4, 2024) (redacted). Vizgen opposed the objection and told the Court "Dr. Puglisi signed Exhibit A to the [Protective Order], explicitly agreeing 'to be bound by and comply with the terms of the [PO].'" *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 395 at 1 (D. Del. Apr. 2, 2024). Therefore, at that time, Dr. Puglisi had knowledge of the parent 737 Patent at issue in the Vizgen-595 Case and had agreed to opine on its validity. On April 5, 2024, the Court sustained 10x's objection to releasing confidential information to Dr. Puglisi based on his connection to Element Biosciences. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 400 (Apr. 5, 2024). **Sixth**, in *10x Genomics, Inc. v. Curio Biosciences, Inc.*, 1:32-cv-01375-MN, Curio retained Dr. Puglisi as their sole technical expert. 10x's technical expert had put the patents asserted in the NanoString-261 and Vizgen-595 Cases at issue regarding technological comparability, and Dr. Puglisi as the sole technical expert for Defendants would have been the

36

expert responsible for addressing them in response. Finally, Element has been aware of the 276 Patent and its infringement at least since May 7, 2026, when 10x notified Element by letter of the 276 Patent and its infringement, and at least since the filing and service of this Complaint

86.    Element, without authority and with knowledge of the 276 Patent, has actively induced and continues to actively induce infringement of one or more claims of the 276 Patent under 35 U.S.C. § 271(b) by making and selling the Accused Instrumentalities in the United States and intentionally instructing and otherwise encouraging others, including Element's customers and end users such as scientists working at laboratories that purchase the Accused Instrumentalities, to use the Accused Instrumentalities in the United States in a manner that infringes one or more claims of the 276 Patent including as described in Attachment B. Element's active inducement of others' infringement began no later than its first shipment and/or installation of the Accused Instrumentalities to one of its customers, end users, partners, or collaborators, which occurred no later than December 2024. *See* Element Biosciences Surpasses 50 AVITI24™ 5D Multiomic System Installations in Just Months, dated July 29, 2025, available at https://www.elementbiosciences.com/news/element-biosciences-surpasses-50-aviti24-5d-multiomic-system-installations-in-just-months. On information and belief, the first direct infringement of the 276 Patent by Element's employees, customers, end users, partners, or collaborators occurred before May 10, 2025, the date of Element's publication that a team of employees had used the Accused Instrumentalities. *See, e.g.*, Vivien Dien, et al., Unraveling Tyrosine-Kinase Inhibitor Resistance in NSCLC Cells via Same-cell Measurement of RNA, Protein, and Morphological Responses, bioRxiv, dated May 10, 2025, available at https://www.biorxiv.org/content/10.1101/2025.05.06.652479v1. On information and belief, one or more of Element's customers and end users of the Accused Instrumentalities have directly

infringed and continue to directly infringe the 276 Patent by using the Accused Instrumentalities in accordance with Element's instructions and encouragement. Element's instruction and encouragement include, for example, distributing the documentation cited in Attachment B, as well as user guides, sample and slide preparation manuals, training decks, and published articles. On information and belief, Element's instruction and encouragement further include, for example, on-site installation of AVITI24 instruments at customers' facilities, on-site training and repairs, phone and email support, instrument and software updates, and distribution of webinars and other training videos. Element provides this instruction and encouragement to its actual and prospective customers and end users with the knowledge and intent that doing so results in the infringement of one or more method claims of the 276 Patent by those customers and end users and/or in their performing each step of one or more methods recited in those claims. As explained below, on information and belief, Element acts knowingly and/or with willful blindness as to the existence of the 276 Patent and of its own infringement and the infringement by others as a result of the 10x-Vizgen Litigation, as well as the knowledge of Element's Scientific Advisory Board Member Dr. Joseph Puglisi.

87.     Element, since at least its first shipment or commercial installation of the AVITI24 platform on or around December 2024, has contributed and continues to contribute to the infringement by others of one or more claims of the 276 Patent pursuant to 35 U.S.C. § 271(c) by importing, selling, and/or offering for sale in the United States without authority the Accused Instrumentalities and/or components thereof specifically so that the Accused Instrumentalities will be used in an infringing manner by others, including use as described in Attachment B by Element's customers and end users. *See, e.g.*, Element Biosciences Surpasses 50 AVITI24™ 5D Multiomic System Installations in Just Months, dated July 29, 2025, available at

https://www.elementbiosciences.com/news/element-biosciences-surpasses-50-aviti24-5d-multiomic-system-installations-in-just-months; *see also* Vivien Dien, et al., Unraveling Tyrosine-Kinase Inhibitor Resistance in NSCLC Cells via Same-cell Measurement of RNA, Protein, and Morphological Responses, bioRxiv, dated May 10, 2025, available at https://www.biorxiv.org/content/10.1101/2025.05.06.652479v1. One or more of Element's customers and end users of the Accused Instrumentalities have directly infringed and continue to directly infringe the 276 Patent by using the Accused Instrumentalities in accordance with Element's instructions and encouragement. *Id.* The AVITI24 platform and Teton chemistry components, including specifically the instruments and reagents, were designed specifically to be used in a manner that infringes the asserted claims of the 276 Patent. Moreover, as shown in Element's instructional materials, there is no other substantial use for the AVITI24 platform with the Teton chemistry or its components. The instruments and reagents are a material part of the claimed inventions of the 276 Patent that result in infringement when used. As a result of Element's selling and/or offering for sale of the AVITI24 and its components, other entities on information and belief use these products for their intended purposes and according to Element's instructions and installation with the result that such entities, such as Element's customers and users of the Accused Instrumentalities, directly infringe the asserted claims of the 276 Patent, literally or under the doctrine of equivalents, for the reasons stated above and in Attachment B. As explained below, on information and belief, Element acts knowingly and/or with willful blindness as to the existence of the 276 Patent and as to the fact that at least the AVITI24 instruments with Teton chemistry and reagents are especially made and adapted for use in an infringing manner, are not staple articles of commerce, and do not have non-infringing uses.

39

88.     Plaintiffs have suffered and continue to suffer damages as a result of Element's infringement of the 276 Patent.

89.     The infringement of the 276 Patent by Element has been, and continues to be, willful and deliberate. At least as of May 7, 2026, if not earlier, Element knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 276 Patent. Such conduct constitutes, at minimum, willful infringement of the 276 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

90.     Unless Element is enjoined from infringing the 276 Patent, Element's efforts to design, develop, market, offer to sell, and sell the Accused Instrumentalities will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

### COUNT III: Infringement of U.S. Patent No. 11,566,277

91.     Plaintiffs incorporate and reallege paragraphs 1 – 90 above as if fully set forth herein.

92.     Element has infringed and continues to infringe one or more claims of the 277 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making and/or using, offering to sell, selling, and/or importing into the United States without authority the Accused Instrumentalities and/or components thereof. Attachment C provides an exemplary infringement claim chart for one asserted claim and exemplary and/or representative Accused Instrumentalities.

93.     Element knew, should have known, or was willfully blind to the existence of the 277 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 277 Patent. *First*, 10x asserted the parent patent to the 277 Patent (the 737 Patent) in two other litigations involving platforms for analysis of analytes in cell or tissue samples. *See 10x Genomics, Inc. v. NanoString Technologies, Inc.*, 1:22-cv-00261-MFK (D. Del.) ("NanoString-

261 Case") and *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK (D. Del.) ("Vizgen-595 Case"). Both the NanoString-261 and Vizgen-595 Cases were widely known in spatial biology. *See, e.g.*, Andrew P. Han, 10x Genomics Sues NanoString, Vizgen Over Spatial Gene Expression Analysis Technologies, GenomeWeb, May 10, 2022, available at https://www.genomeweb.com/business-news/10x-genomics-sues-nanostring-vizgen-over-spatial-gene-expression-analysis. *Second*, On November 28, 2023, or shortly thereafter, 10x had served a document subpoena on Element in both cases. *See, e.g.*, *10x Genomics, Inc. v. NanoString Technologies, Inc.*, 1:22-cv-00261-MFK, D.I. 214, Exhibit 6 (D. Del. Nov. 28, 2023). 10x subsequently served a deposition subpoena on Element on April 10, 2024. *See, e.g.*, *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 407, Exhibit 5 (D. Del.  Apr. 9, 2024). On information and belief, by November 28, 2023 or shortly thereafter, Element had knowledge of or was willfully blind to the existence of the 277 Patent. *Third*, in the Vizgen-595 Case, 10x had also asserted a parent patent to the 277 Patent (U.S. Patent No. 10,227,639 ("the 639 Patent")), and the European counterpart of the 639 patent (EP4108782) was at issue at the Unified Patent Court when 10x sought a preliminary injunction, which was highly publicized and well known in the genomics field as it was the first lawsuit filed in that Court. *See* "10x Genomics Files Two New Lawsuits Requesting Preliminary Injunctions Against NanoString's CosMx Products," PR Newswire, dated July 1, 2023, available at https://www.prnewswire.com/news-releases/10x-genomics-files-two-new-lawsuits-requesting-preliminary-injunctions-against-nanostrings-cosmx-products-301839927.html. *Fourth*, on information and belief Element actively monitored the related patent families from the NanoString and Vizgen litigations and cited them during prosecution of Element patent applications, including US20210123098 at 6/6/2022 information disclosure statement by applicant; US20240052398 at 5/14/2024 information disclosure statement by applicant; and

US20250349138A1 at 4/4/2025 information disclosure statement by applicant and 4/4/2025 citation of the 3/28/2024 international search report for PCT/US2023/076125. *Fifth*, in the Vizgen-595 Case, on or before March 29, 2024, Vizgen disclosed Dr. Joseph Puglisi as an expert witness on validity issues, including the validity of the parent 737 Patent. 10x objected to the disclosure of 10x sensitive commercial information under the protective order based upon his position as Chairman of the Scientific Advisory Board of Element. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 390 (D. Del. Mar. 29, 2024) (sealed) and 401 (D. Del. Apr. 4, 2024) (redacted). Vizgen opposed the objection and told the Court "Dr. Puglisi signed Exhibit A to the [Protective Order], explicitly agreeing 'to be bound by and comply with the terms of the [PO].'" *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 395 at 1 (D. Del. Apr. 2, 2024). Therefore, at that time, Dr. Puglisi had knowledge of the parent 737 Patent at issue in the Vizgen-595 Case, and had agreed to opine on its validity. On April 5, 2024, the Court sustained 10x's objection to releasing confidential information to Dr. Puglisi based on his connection to Element Biosciences. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 400 (Apr. 5, 2024). *Sixth*, in *10x Genomics, Inc. v. Curio Biosciences, Inc.*, 1:32-cv-01375-MN, Curio retained Dr. Puglisi as their sole technical expert. 10x's technical expert had put the patents asserted in the NanoString-261 and Vizgen-595 Cases at issue regarding technological comparability, and Dr. Puglisi as the sole technical expert for Defendants would have been the expert responsible for addressing them in response. Finally, Element has been aware of the 277 Patent and its infringement at least since May 7, 2026, when 10x notified Element by letter of the 277 Patent and its infringement, and at least since the filing and service of this Complaint

94.    Element, without authority and with knowledge of the 277 Patent, has actively induced and continues to actively induce infringement of one or more claims of the 277 Patent

42

under 35 U.S.C. § 271(b) by making and selling the Accused Instrumentalities in the United States and intentionally instructing and otherwise encouraging others, including Element's customers and end users such as scientists working at laboratories that purchase the Accused Instrumentalities, to use the Accused Instrumentalities in the United States in a manner that infringes one or more claims of the 277 Patent including as described in Attachment C. Element's active inducement of others' infringement began no later than its first shipment and/or installation of the Accused Instrumentalities to one of its customers, end users, partners, or collaborators, which occurred no later than December 2024. *See* Element Biosciences Surpasses 50 AVITI24$^{TM}$ 5D Multiomic System Installations in Just Months, dated July 29, 2025, available at https://www.elementbiosciences.com/news/element-biosciences-surpasses-50-aviti24-5d-multiomic-system-installations-in-just-months. On information and belief, the first direct infringement of the 277 Patent by Element's employees, customers, end users, partners, or collaborators occurred before May 10, 2025, the date of Element's publication that a team of employees had used the Accused Instrumentalities. *See, e.g.*, Vivien Dien, et al., Unraveling Tyrosine-Kinase Inhibitor Resistance in NSCLC Cells via Same-cell Measurement of RNA, Protein, and Morphological Responses, bioRxiv, dated May 10, 2025, available at https://www.biorxiv.org/content/10.1101/2025.05.06.652479v1. On information and belief, one or more of Element's customers and end users of the Accused Instrumentalities have directly infringed and continue to directly infringe the 277 Patent by using the Accused Instrumentalities in accordance with Element's instructions and encouragement. Element's instruction and encouragement include, for example, distributing the documentation cited in Attachment C, as well as user guides, sample and slide preparation manuals, training decks, and published articles. On information and belief, Element's instruction and encouragement further include, for example,

43

on-site installation of AVITI24 instruments at customers' facilities, on-site training and repairs, phone and email support, instrument and software updates, and distribution of webinars and other training videos. Element provides this instruction and encouragement to its actual and prospective customers and end users with the knowledge and intent that doing so results in the infringement of one or more method claims of the 277 Patent by those customers and end users and/or in their performing each step of one or more methods recited in those claims. As explained below, on information and belief, Element acts knowingly and/or with willful blindness as to the existence of the 277 Patent and of its own infringement and the infringement by others as a result of the 10x-Vizgen Litigation, as well as the knowledge of Element's Scientific Advisory Board Member Dr. Joseph Puglisi.

95.    Element, since at least its first shipment or commercial installation of the AVITI24 platform on or around December 2024, has contributed and continues to contribute to the infringement by others of one or more claims of the 277 Patent pursuant to 35 U.S.C. § 271(c) by importing, selling, and/or offering for sale in the United States without authority the Accused Instrumentalities and/or components thereof specifically so that the Accused Instrumentalities will be used in an infringing manner by others, including use as described in Attachment C by Element's customers and end users. *See, e.g.*, Element Biosciences Surpasses 50 AVITI24™ 5D Multiomic System Installations in Just Months, dated July 29, 2025, available at https://www.elementbiosciences.com/news/element-biosciences-surpasses-50-aviti24-5d-multiomic-system-installations-in-just-months; *see also* Vivien Dien, et al., Unraveling Tyrosine-Kinase Inhibitor Resistance in NSCLC Cells via Same-cell Measurement of RNA, Protein, and Morphological Responses, bioRxiv, dated May 10, 2025, available at https://www.biorxiv.org/content/10.1101/2025.05.06.652479v1. One or more of Element's

customers and end users of the Accused Instrumentalities have directly infringed and continue to directly infringe the 277 Patent by using the Accused Instrumentalities in accordance with Element's instructions and encouragement. *Id.* The AVITI24 platform and Teton chemistry components, including specifically the instruments and reagents, were designed specifically to be used in a manner that infringes the asserted claims of the 277 Patent. Moreover, as shown in Element's instructional materials, there is no other substantial use for the AVITI24 platform with the Teton chemistry or its components. The instruments and reagents are a material part of the claimed inventions of the 277 Patent that result in infringement when used. As a result of Element's selling and/or offering for sale of the AVITI24 and its components, other entities on information and belief use these products for their intended purposes and according to Element's instructions and installation with the result that such entities, such as Element's customers and users of the Accused Instrumentalities, directly infringe the asserted claims of the 277 Patent, literally or under the doctrine of equivalents, for the reasons stated above and in Attachment C. As explained below, on information and belief, Element acts knowingly and/or with willful blindness as to the existence of the 277 Patent and as to the fact that at least the AVITI24 instruments with Teton chemistry and reagents are especially made and adapted for use in an infringing manner, are not staple articles of commerce, and do not have non-infringing uses.

96.    Plaintiffs have suffered and continue to suffer damages as a result of Element's infringement of the 277 Patent.

97.    The infringement of the 277 Patent by Element has been, and continues to be, willful and deliberate. At least as of May 7, 2026, if not earlier, Element knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the

45

277 Patent. Such conduct constitutes, at minimum, willful infringement of the 277 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

98.    Unless Element is enjoined from infringing the 277 Patent, Element's efforts to design, develop, market, offer to sell, and sell the Accused Instrumentalities will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

**COUNT IV: Infringement of U.S. Patent No. 12,264,358**

99.    Plaintiffs incorporate and reallege paragraphs 1 – 98 above as if fully set forth herein.

100.    Element has infringed and continues to infringe one or more claims of the 358 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making and/or using, offering to sell, selling, and/or importing into the United States without authority the Accused Instrumentalities and/or components thereof. Attachment D provides an exemplary infringement claim chart for one asserted claim and exemplary and/or representative Accused Instrumentalities.

101.    Element knew, should have known, or was willfully blind to the existence of the 358 Patent and that the conduct identified herein would result in the infringement of one or more claims of the 358 Patent. ***First***, 10x asserted the parent patent to the 358 Patent (the 767 Patent) in another litigation involving platforms for analysis of analytes in cell or tissue samples. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK (D. Del.) ("Vizgen-595 Case"). The Vizgen-595 Case was widely known in spatial biology. *See, e.g.*, Andrew P. Han, 10x Genomics Sues NanoString, Vizgen Over Spatial Gene Expression Analysis Technologies, GenomeWeb, May 10, 2022, available at https://www.genomeweb.com/business-news/10x-genomics-sues-nanostring-vizgen-over-spatial-gene-expression-analysis. ***Second***, On November 28, 2023, or shortly thereafter, 10x had served a document subpoena on Element in the Vizgen-595 Case. *See, e.g., 10x*

46

*Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 276, Exhibit 6 (D. Del. Nov. 28, 2023). 10x subsequently served a deposition subpoena on Element on April 10, 2024. *See, e.g.*, *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 407, Exhibit 5 (D. Del.  Apr. 9, 2024). On information and belief, by November 28, 2023 or shortly thereafter, Element had knowledge of or was willfully blind to the existence of the 358 Patent. ***Third***, on information and belief Element actively monitored the related patent families and cited them during prosecution of Element patent applications, including US20210123098 at 6/6/2022 information disclosure statement by applicant; US20240052398 at 5/14/2024 information disclosure statement by applicant; and US20250349138A1 at 4/4/2025 information disclosure statement by applicant and 4/4/2025 citation of the 3/28/2024 international search report for PCT/US2023/076125.  ***Fourth***, in the Vizgen-595 Case, on or before March 29, 2024, Vizgen disclosed Dr. Joseph Puglisi as an expert witness on validity issues, including the validity of the parent 767 Patent. 10x objected to the disclosure of 10x sensitive commercial information under the protective order based upon his position as Chairman of the Scientific Advisory Board of Element. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 390 (D. Del. Mar. 29, 2024) (sealed) and 401 (D. Del. Apr. 4, 2024) (redacted). Vizgen opposed the objection and told the Court "Dr. Puglisi signed Exhibit A to the [Protective Order], explicitly agreeing 'to be bound by and comply with the terms of the [PO].'" *10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 395 at 1 (D. Del. Apr. 2, 2024). Therefore, at that time, Dr. Puglisi had knowledge of the parent 767 Patent at issue in the Vizgen-595 Case, and had agreed to opine on its validity. On April 5, 2024, the Court sustained 10x's objection to releasing confidential information to Dr. Puglisi based on his connection to Element Biosciences. *See 10x Genomics, Inc. v. Vizgen, Inc.*, 1:22-cv-00595-MFK, D.I. 400 (Apr. 5, 2024). ***Fifth***, in *10x Genomics, Inc. v. Curio Biosciences, Inc.*, 1:32-cv-01375-MN, Curio

retained Dr. Puglisi as their sole technical expert. 10x's technical expert had put the patents asserted in the NanoString-261 and Vizgen-595 Cases at issue regarding technological comparability, and Dr. Puglisi as the sole technical expert for Defendants would have been the expert responsible for addressing them in response. Finally, Element has been aware of the 358 Patent and its infringement at least since May 7, 2026, when 10x notified Element by letter of the 358 Patent and its infringement, and at least since the filing and service of this Complaint

102. Element, without authority and with knowledge of the 358 Patent, has actively induced and continues to actively induce infringement of one or more claims of the 358 Patent under 35 U.S.C. § 271(b) by making and selling the Accused Instrumentalities in the United States and intentionally instructing and otherwise encouraging others, including Element's customers and end users such as scientists working at laboratories that purchase the Accused Instrumentalities, to use the Accused Instrumentalities in the United States in a manner that infringes one or more claims of the 358 Patent including as described in Attachment D. Element's active inducement of others' infringement began no later than its first shipment and/or installation of the Accused Instrumentalities to one of its customers, end users, partners, or collaborators, which occurred no later than December 2024. *See* Element Biosciences Surpasses 50 AVITI24™ 5D Multiomic System Installations in Just Months, dated July 29, 2025, available at https://www.elementbiosciences.com/news/element-biosciences-surpasses-50-aviti24-5d-multiomic-system-installations-in-just-months. On information and belief, the first direct infringement of the 358 Patent by Element's employees, customers, end users, partners, or collaborators occurred before May 10, 2025, the date of Element's publication that a team of employees had used the Accused Instrumentalities. *See, e.g.*, Vivien Dien, et al., Unraveling Tyrosine-Kinase Inhibitor Resistance in NSCLC Cells via Same-cell Measurement of RNA,

Protein, and Morphological Responses, bioRxiv, dated May 10, 2025, https://www.biorxiv.org/content/10.1101/2025.05.06.652479v1. On information and belief, one or more of Element's customers and end users of the Accused Instrumentalities have directly infringed and continue to directly infringe the 358 Patent by using the Accused Instrumentalities in accordance with Element's instructions and encouragement. Element's instruction and encouragement include, for example, distributing the documentation cited in Attachment D, as well as user guides, sample and slide preparation manuals, training decks, and published articles. On information and belief, Element's instruction and encouragement further include, for example, on-site installation of AVITI24 instruments at customers' facilities, on-site training and repairs, phone and email support, instrument and software updates, and distribution of webinars and other training videos. Element provides this instruction and encouragement to its actual and prospective customers and end users with the knowledge and intent that doing so results in the infringement of one or more method claims of the 358 Patent by those customers and end users and/or in their performing each step of one or more methods recited in those claims. As explained below, on information and belief, Element acts knowingly and/or with willful blindness as to the existence of the 358 Patent and of its own infringement and the infringement by others as a result of the 10x-Vizgen Litigation, as well as the knowledge of Element's Scientific Advisory Board Member Dr. Joseph Puglisi.

103.    Element, since at least its first shipment or commercial installation of the AVITI24 platform on or around December 2024, has contributed and continues to contribute to the infringement by others of one or more claims of the 358 Patent pursuant to 35 U.S.C. § 271(c) by importing, selling, and/or offering for sale in the United States without authority the Accused Instrumentalities and/or components thereof specifically so that the Accused Instrumentalities will

be used in an infringing manner by others, including use as described in Attachment D by Element's customers and end users. *See, e.g.*, Element Biosciences Surpasses 50 AVITI24™ 5D Multiomic System Installations in Just Months, dated July 29, 2025, available at https://www.elementbiosciences.com/news/element-biosciences-surpasses-50-aviti24-5d-multiomic-system-installations-in-just-months; *see also* Vivien Dien, et al., Unraveling Tyrosine-Kinase Inhibitor Resistance in NSCLC Cells via Same-cell Measurement of RNA, Protein, and Morphological Responses, bioRxiv, dated May 10, 2025, available at https://www.biorxiv.org/content/10.1101/2025.05.06.652479v1. One or more of Element's customers and end users of the Accused Instrumentalities have directly infringed and continue to directly infringe the 358 Patent by using the Accused Instrumentalities in accordance with Element's instructions and encouragement. *Id.* The AVITI24 platform and Teton chemistry components, including specifically the instruments and reagents, were designed specifically to be used in a manner that infringes the asserted claims of the 358 Patent. Moreover, as shown in Element's instructional materials, there is no other substantial use for the AVITI24 platform with the Teton chemistry or its components. The instruments and reagents are a material part of the claimed inventions of the 358 Patent that result in infringement when used. As a result of Element's selling and/or offering for sale of the AVITI24 and its components, other entities on information and belief use these products for their intended purposes and according to Element's instructions and installation with the result that such entities, such as Element's customers and users of the Accused Instrumentalities, directly infringe the asserted claims of the 358 Patent, literally or under the doctrine of equivalents, for the reasons stated above and in Attachment D. As explained below, on information and belief, Element acts knowingly and/or with willful blindness as to the existence of the 358 Patent and as to the fact that at least the AVITI24 instruments with Teton chemistry and

reagents are especially made and adapted for use in an infringing manner, are not staple articles of commerce, and do not have non-infringing uses.

104. Plaintiffs have suffered and continue to suffer damages as a result of Element's infringement of the 358 Patent.

105. The infringement of the 358 Patent by Element has been, and continues to be, willful and deliberate. At least as of May 7, 2026, if not earlier, Element knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the 358 Patent. Such conduct constitutes, at minimum, willful infringement of the 358 Patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

106. Unless Element is enjoined from infringing the 358 Patent, Element's efforts to design, develop, market, offer to sell, and sell the Accused Instrumentalities will cause Plaintiffs to suffer irreparable injury for which damages are an inadequate remedy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter the following relief in their favor and against Element:

A. For entry of judgment that the 737 Patent, 276 Patent, 277 Patent, and 358 Patent have been and continue to be infringed by Element, either literally or under the doctrine of equivalents;

B. For entry of judgment that Element's infringement has been willful and deliberate;

C. For a declaration that each of the Harvard Patents is valid and enforceable;

D. For permanent injunctions enjoining the aforesaid acts of infringement by Element, its officers, agents, servants, employees, attorneys, parent and subsidiary entities, assigns and successors in interest, and those persons acting in concert with them, including related individuals and entities, customers, representatives, distributors,

51

and dealers. In the alternative, if the Court finds that an injunction is not warranted, Plaintiffs request an award of post-judgment royalty to compensate for future infringement;

E.   An award of all monetary relief adequate to compensate for damages resulting from Element's infringement, including lost profits but in no event less than a reasonable royalty under 35 U.S.C. § 284 for Element's infringement, including all pre-judgment and post-judgment interest at the maximum rate allowed by law, and damages for willful infringement;

F.   A declaration that the case is an exceptional case and that Element be required to pay Plaintiffs' attorneys' fees pursuant to 35 U.S.C. § 285; and

G.   A judgment awarding Plaintiffs such other and further relief as the Court may deem just, reasonable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all issues so triable.

*Of Counsel*:

TENSEGRITY LAW GROUP LLP

Matthew Powers
Paul Ehrlich
Li Shen
555 Twin Dolphin Drive
Suite 650
Redwood Shores, CA 94065
Tel: (650) 802-6000
matthew.powers@tensegritylawgroup.com
paul.ehrlich@tensegritylawgroup.com
li.shen@tensegritylawgroup.com

Azra Hadzimehmedovic
Ronald Pabis
Kiley White
1676 International Dr.
Suite 910
McLean, VA 22102
Tel: (650) 802-6000
azra@tensegritylawgroup.com
ron.pabis@tensegritylawgroup.com
kiley.white@tensegritylawgroup.com

Dated: May 8, 2026

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
Alexandra M. Ewing (#6407)
Gabriela Z. Monasterio (#7240)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com
ewing@rlf.com
monasterio@rlf.com

*Attorneys for Plaintiffs*